# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TERRIE LEA PAYTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 14-CV-463-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Terrie Lea Payton ("Payton"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Payton appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that she was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Payton was 53 years old at the time of the hearing before the ALJ on November 28, 2012. (R. 40). She dropped out of school in the tenth grade, but later obtained her GED. (R. 47-48).

Payton testified to a history of neck pain, left shoulder pain, and left arm pain following an injury at work. (R. 67). Payton explained that surgery for carpal tunnel syndrome had resolved the pain in her left shoulder and left arm. (R. 68-70). Following the surgery, Payton developed pain on the right side of her neck, with pain radiating down her right arm. (R. 63-66, 67-70). After continued "excruciating" pain in her neck, right shoulder, and right arm, Payton underwent surgery to replace a disc in her neck. (R. 68). Payton's neck pain improved after this surgery, but she had ongoing problems with right shoulder pain and right arm pain. (R. 67-69).

Payton testified that she experienced pain on a daily basis. (R. 58). She rated her pain as a "ten" on a "really bad" day. (R. 58-59). Payton said that her pain was "tolerable" on a good day. (R. 59). She estimated that she had about two to three good days a week. (R. 70-71). Payton was prescribed Lortab and took one to two pills on a "medium day," and four pills on a bad day. (R. 57-58, 60). Other than getting up to use the restroom, she stayed in bed on a bad day. (R. 71).

Payton was able to lift things up to her shoulder level, but lifting anything above her head created neck pain and "stabbing" pain in her shoulders. (R. 73-74). Payton reported difficulty with numbness and weakness in her arms. (R. 73). Numbness affected the grip strength in Payton's right hand, and occasionally caused her to drop things. (R. 70, 73). Payton was right-handed. (R. 41).

Payton said that she could stand for about 35 to 40 minutes at a time. (R. 74). Payton could walk about eight blocks before needing to take a break. *Id.* She could sit for about an hour and a half at one time. *Id.*

Payton was able to do the laundry, wash dishes, vacuum, sweep, and grocery shop on a good day. (R. 70-71). She took care of her grandchildren three to four times a month. (R. 71-72). She did not have any hobbies. (R. 73).

On May 15, 2008, James R. Campbell, D.O., examined Payton following an on-the-job accident on May 11, 2008, which had resulted in an onset of neck pain and low back pain. (R. 261). Payton described her pain as a "10" out of 10. *Id.* On examination, Payton had tenderness of her cervical and lumbar spine, and paraspinal muscle spasms. *Id.*

Payton saw Dr. Campbell on May 20, 2008 for complaints of neck pain and stiffness. (R. 251). At Payton's appointment on May 30, 2008, she was given a cervical injection. (R. 256). Payton requested a release to work. *Id.*

On March 23, 2009, Payton was seen at Saint Francis Hospital for left shoulder pain. (R. 432-33). One diagnosis was exacerbation of chronic left shoulder pain. (R. 433).

On April 17, 2009, R. Tyler Boone, M.D., examined Payton for complaints of neck pain and left shoulder pain. (R. 366-67). Dr. Boone noted that Payton had previously tried physical therapy, medication, and two epidural steroid injections for her pain and that these treatments had proved unsuccessful. *Id.* Dr. Boone noted in detail the results of Payton's cervical spine MRI, an EM/nerve conduction study completed in September 2008, and cervical spine x-rays. *Id.* On examination, Dr. Boone described Payton's range of motion of her cervical spine as "very limited." *Id.* Extending and turning her head to the right caused numbness, weakness, and tingling in her left arm. (R. 367). Dr. Boone wrote that Payton's work injury had most likely exacerbated a pre-existing cervical strain. *Id.* He ordered a cervical spine myelogram CT. *Id.* Dr. Boone said that Payton could work "as long as she avoids repetitive overhead activities and keeps her lifting in the 15 lb range." *Id.*

On June 15, 2009, Dr. Boone reviewed cervical myelogram CT results with Payton. (R. 365). Dr. Boone recommended that Payton undergo a C5-C6 anterior cervical discectomy with fusion surgery. *Id.* Dr. Boone referred Payton to a surgeon for consultation. *Id.* Dr. Boone said that Payton could work with the previously outlined restrictions. *Id.*

On August 19, 2009, Frank J. Hackl, M.D., performed a cervical provocative discogram at C4-C5, C5-6, C6-7, and C7-T1. (R. 336-38, 451-52, 585).

On August 31, 2009, Dr. Boone wrote that Dr. Hackl recommended that Payton should have a surgical cervical discectomy at the C5-C6 level. (R. 364). Dr. Boone said that he continued to believe that Payton could work with the prior restrictions of avoiding repetitive overhead activities and no lifting above 15 pounds. *Id.*

On October 27, 2009, Payton underwent anterior cervical discectomy at C5-C6. (R. 306-31). Payton saw Dr. Boone for follow-up on November 18, 2009. (R. 362). On December 9, 2009, Dr. Boone noted that Payton was doing well overall. (R. 361). Dr. Boone wrote that Payton remained temporarily totally disabled. *Id.*

On January 6, 2010, Dr. Boone said that he thought Payton could work a "sedentary or light position," lifting less than 20 pounds and having limited overhead activities. (R. 359). At Payton's appointment on February 3, 2010, Dr. Boone said that Payton could work a job with maximum lifting of 40 pounds or less and avoiding repetitive overhead activities. (R. 358).

On March 3, 2010, Payton told Dr. Boone that she was working, but was experiencing neck pain towards the end of the day. (R. 357). Dr. Boone ordered a thin-sliced CAT scan. *Id.*

On March 31, 2010, Dr. Boone said that the thin-sliced CAT scan showed a "solid fusion." (R. 356). Dr. Boone said that Payton needed permanent restrictions of a 50-pound

4

maximum lifting limitation, a 20- to 25-pound repetitive lifting limitation, and avoidance of repetitive overhead activities. *Id.*

On June 28, 2010, Payton saw Dr. Boone and reported numbness and tingling in her right arm with radiation down to her hand. (R. 355). She reported difficulty sleeping due to numbness and tingling in her right arm and hand. *Id.* Dr. Boone said that Payton could work with a 50-pound lifting limitation, with repetitive lifting in the 20- to 25-pound range. *Id.*

On August 31, 2010, Payton underwent a right arm EMG/nerve conduction study. (R. 372, 448). Impressions were possible previous C5-C6 radiculopathy without acute denervation; and mild carpal tunnel syndrome. *Id.*

Payton saw Dr. Boone on September 13, 2010, for ongoing complaints of pain in her neck and right arm. (R. 353). On examination, Payton displayed good bilateral upper arm strength. *Id.* Dr. Boone prescribed medication, and ordered a cervical spine MRI. *Id.* Dr. Boone said that Payton could continue to work with the previously outlined restrictions. *Id.*

An MRI of Payton's cervical spine on October 21, 2010, showed "C5-6 ACDF changes. Degenerative disk and uncovertebral joint changes at C3-4, C4-5 and C6-7. Moderate canal stenosis with particular left lateral recess and left neural foraminal stenosis noted at C6-7." (R. 370-71).

Payton saw Dr. Boone on October 27, 2010, for continuing right arm pain. (R. 352). Dr. Boone said that Payton could work, keeping her maximum lifting to 50 pounds and her repetitive lifting to 20 pounds or less, and avoiding repetitive overhead activities. *Id.* Dr. Boone ordered cervical myelogram CT scans. *Id.*

On January 4, 2011, Payton had a cervical spine myelogram CT at Oklahoma Surgical Hospital. (R. 297-99, 368-69, 493-501). On January 21, 2011, Dr. Boone reviewed the results of

the myelogram CT. (R. 351). Dr. Boone said that Payton could continue to work with avoiding overhead activities, a 30-pound weight limitation, and avoiding repetitive bending and stooping. *Id.*

On August 30, 2011, Terry G. Shaw, Ph.D., completed a psychological examination of Payton in relation to her worker's compensation proceedings. (R. 393-99). Dr. Shaw administered tests and scored the results, which showed pain-related somatoform disorder with depression. (R. 397). Dr. Shaw said that Payton's pain, emotional distress, and pain-related impairments were "moderately" exaggerated and overstated. (R. 394, 396-98). Dr. Shaw additionally wrote that Payton had a "tendency to exaggerate the severity of her condition," which was more consistent with a "plea for help than an attempt to malinger or feign psychiatric illness." (R. 397).

On October 13, 2011, Payton was admitted to Oklahoma Surgical Hospital for removal of anterior spinal instrumentation at C5-C6; anterior cervical fusion at C4-C5; and anterior cervical plate at C4-C5. (R. 455-90, 505-64, 570-84).

On March 26, 2013, Payton presented to Tania T. Kannadan, M.D., at OU Physicians Psychiatry Clinic. (R. 588-97). Payton told Dr. Kannadan that she was depressed and needed help. (R. 589). She said that her mood started going "downhill" in 2009 after getting injured at work. *Id.* Dr. Kannadan's Axis I[1] diagnoses were major depressive disorder, recurrent, moderate; generalized anxiety disorder; rule out panic attacks with agoraphobia; other unspecified alcohol dependence remission; nicotine dependence; and history of polysubstance

---

[1] The multiaxial assessment system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter referred to as DSM-IV).

dependence. (R. 594-95). Dr. Kannadan assessed Payton's Global Assessment of Functioning ("GAF")[2] as 55. (R. 594). Payton was prescribed Zoloft and Trazodone. (R. 594).

Agency nonexamining consultant Janice B. Smith, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment dated September 15, 2011. (R. 402-18). In the Psychiatric Review Technique form, for Listing 12.04, Dr. Smith noted depressive syndrome. (R. 408). For Listing 12.07, Dr. Smith noted somatoform disorder. (R. 411). For the "Paragraph B Criteria,"[3] Dr. Smith indicated that Payton had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. (R. 415). In the "Consultant's Notes" portion of the form, Dr. Smith stated that Payton had been prescribed Cymbalta for depression, but that she had not been

---

[2] The GAF score represents Axis V of the multiaxial assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning," and 51-60 reflects moderate symptoms or moderate difficulty in functioning. *Id.* Scores between 61-70 reflect "some mild symptoms" or "some difficulty" in functioning, but "generally functioning pretty well." *Id.* A score between 71 and 80 reflects symptoms that are transient and reactions to stressors with no more than slight impairment in functioning. *Id. See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

7

treated by a mental health professional. (R. 417). Dr. Smith summarized Dr. Shaw's examination and said that Payton had somatoform disorder with major depression and that her symptoms appeared to be "moderately exaggerated." *Id.* She noted Payton's activities of daily living. *Id.* Dr. Smith wrote that Payton appeared to be able to do simple and some detailed tasks that required only superficial interactions with the general public. *Id.*

In the Mental Residual Functional Capacity Assessment, Dr. Smith indicated that Payton was moderately limited in her ability to understand, remember, and carry out detailed instructions and in her ability to interact appropriately with the general public. (R. 400-01). Dr. Smith found no other limitations. *Id.* In the narrative section, Dr. Smith wrote that Payton could perform simple one- and two-step tasks and some more detailed tasks with routine supervision. (R. 402). She said that Payton could work a normal work day and work week and that she could adapt to a work setting. *Id.* Payton could relate to supervisors, coworkers, and the general public about routine matters. *Id.* Dr. Smith said that Payton would not be effective in interpersonal problem-solving or mediation tasks. *Id.*

Nonexamining agency consultant Karl K. Boatman, M.D., completed a Physical Residual Functional Capacity Assessment on September 30, 2011. (R. 419-26). Dr. Boatman indicated that Payton could perform work at the "light" exertional level. (R. 420). In the space for narrative explanation, Dr. Boatman summarized Payton's history of treatment and related diagnostic scans for back pain. (R. 420-21). He noted Payton's activities of daily living. (R. 421). For postural limitations, Dr. Boatman found that Payton could occasionally climb ramps and stairs, but could never climb a ladder, rope, or scaffolding. *Id.* He found Payton could occasionally balance, stoop, kneel, crouch, or crawl. *Id.* For manipulative limitations, Dr. Boatman found that Payton was limited in ability to reach in all directions. (R. 422). He found

8

no other manipulative limitations, and he found no visual, communicative, or environmental limitations. (R. 422-23).

## Procedural History

Payton filed her applications for disability insurance benefits and supplemental security income benefits with a protective filing date of June 7, 2011. (R. 159-69). The applications were denied initially and on reconsideration. (R. 105-13, 117-22). An administrative hearing was held before ALJ John W. Belcher on November 28, 2012. (R. 35-96). By decision dated January 25, 2013, the ALJ found that Payton was not disabled. (R. 22-30). On June 13, 2014, the Appeals Council denied review. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981, 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant

9

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

**Decision of the Administrative Law Judge**

In his decision, the ALJ found that Payton met insured status requirements through December 31, 2012. (R. 24). At Step One, the ALJ found that Payton had not engaged in any substantial gainful activity since her alleged onset date of May 9, 2008. *Id.* At Step Two, the ALJ found that Payton had severe impairments of "levoscoliosis of the lumbar spine with

---

suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

degenerative disc disease, degenerative disc disease of the cervical spine status post two surgeries October 11, 2009 and 2011, status post hip arthroscopy October 11, 2009, mood disorder[,] and somatoform disorder." *Id.* At Step Three, the ALJ found that Payton's impairments did not meet any Listing. (R. 25).

The ALJ found that Payton had the RFC to perform light work with the following additional limitations:

> The claimant is able to climb stairs, balance, bend, stoop, kneel, crouch and crawl occasionally, but the claimant is unable to climb ladders, ropes and scaffolding. The claimant must avoid concentrated exposure to vibration or vibratory tools. The claimant is able to perform simple tasks and three to four step work. The claimant is able to have superficial contact with co-workers, supervisors and the public, but the claimant is unable to perform work that requires interpersonal problem solving or mediation tasks.

(R. 27). At Step Four, the ALJ determined that Payton was able to perform past relevant work. (R. 30). Therefore, the ALJ found that Payton was not disabled from May 9, 2008 through the date of his decision. *Id.*

**Review**

Payton states one error on appeal: "The ALJ failed to provide a clear, sound, and well-supported 'narrative discussion' in support of the RFC adopted for Plaintiff, as required by SSR 96-8p and other regulations." Plaintiff's Opening Brief, Dkt. #19, p. 4. The Court agrees with Payton that the ALJ's consideration of the opinion evidence of treating physician Dr. Boone was legally insufficient. For this reason, the ALJ decision's is **REVERSED AND REMANDED**.

Before proceeding to review Payton's single issue on appeal, the Court addresses the requirement that a Social Security claimant must adequately develop arguments before a district court. *Wall*, 561 F.3d at 1066. In *Wall*, the court discussed an argument related to the claimant's RFC. *Id.* The Tenth Circuit noted that at the district court level, the claimant had merely

11

alleged, several times, that the ALJ had failed to consider the objective medical evidence. *Id.* The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue. *Id.* (quotation and citation omitted). In another case, the Tenth Circuit explained that it was unable to address the claimant's asserted issue that the ALJ erred in failing to articulate reasons for disregarding the opinions of treating physicians because the argument was not sufficiently developed. *Threet v. Barnhart*, 353 F.3d 1185, 1190 (10th Cir. 2003). "[C]laimant does not identify which treating physician she feels was ignored, and we will not speculate on her behalf." Similarly, the Tenth Circuit in another case said that it was a "dangerous practice" for a claimant to leave the court to "comb through the briefs and the record" to ascertain what the claimant's arguments were. *Eacret v. Barnhart*, 120 Fed. Appx. 264, 265-66 (10th Cir. 2005) (unpublished). The *Eacret* court said that it was "not required to speculate on what a party is arguing or to craft her arguments for her." *Id.* at 266.

Payton has come perilously close to waiving her one issue due to failure to develop her argument in a fashion that allows for meaningful review. Not until page 8 of her Opening Brief did Payton's argument finally specify that the ALJ had failed to include one of Dr. Boone's functional limitations, "avoid repetitive overhead activity," in his RFC determination. Plaintiff's Opening Brief, Dkt. #19. The Court urges counsel, in future briefs, to make specific arguments, complete with citations to the record and to legal authority.

An ALJ is required to discuss all opinion evidence and to explain what weight he gives it. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). "Regardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an

12

examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson*, 366 F.3d at 1084. A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques" and it is not inconsistent with other substantial evidence in the record. *Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

Here, the ALJ accurately discussed the opinion evidence of Dr. Boone. (R. 28). The ALJ noted that one of Dr. Boone's restrictions was "avoiding overhead activities." *Id.* He then said that "[t]he limitations placed by [Payton's] treating physician are actually less restrictive" than his RFC finding. *Id.* This statement of the ALJ is erroneous because Dr. Boone repeatedly included a restriction on overhead activities, but the ALJ's RFC determination did not include any such restriction. (R. 26-28, 351-52, 356, 358-59, 364-67). Thus, at least in this one respect, Dr. Boone's opinions were more restrictive than the limitations found by the ALJ. The ALJ accurately noted the limitation, but he did not explain his failure to adopt this portion of Dr. Boone's treating physician opinion. This was error. *Robinson*, 366 F.3d at 1083 (an ALJ is "not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability"); *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (ALJ's implicit rejection of some portions of opinion evidence without explanation was error).

The Commissioner states that the ALJ was not required to include a limitation on repetitive overhead lifting because he did not find it supported by the record. Commissioner's Response Brief, Dkt. #20, p. 9. The difficulty is that the ALJ did not say this. (R. 22-30). The ALJ did not explicitly reject Dr. Boone's opinion on avoidance of overhead activities, and so he gave no explanation for the rejection, and he certainly did not explain that he found that specific part of Dr. Boone's opinions to be unsupported by the record. The Commissioner's efforts are in the nature of *post hoc* justification of the ALJ's decision, and the undersigned will not usurp the ALJ's function by making findings that are not contained in his decision. *Krauser v. Astrue*, 638 F.3d 1324, 1328-30 (10th Cir. 2011) (*post hoc* justifications of ALJ's analysis of treating physician opinion were prohibited); *Carpenter*, 537 F.3d at 1267 (*post hoc* rationale is improper because it usurps agency's function of weighing and balancing evidence in the first instance).

Further, the ALJ never discussed another piece of opinion evidence that supported Dr. Boone's restriction on overhead activities. The agency's own nonexamining consultant, Dr. Boatman, checked a box for manipulative limitations, reflecting that Payton had a limitation in her ability to reach in all directions, including overhead reaching. (R. 422). The Court can find no reference to Dr. Boatman's report in the ALJ's decision. (R. 22-30). The ALJ did make a general statement that the opinions of the agency consultants supported his RFC determination. (R. 29). Again, however, the ALJ's statement is incorrect because Dr. Boatman included a manipulative limitation on reaching in all directions, including overhead reaching, and the ALJ did not include such a limitation in his RFC. (R. 26-27, 422). It appears, moreover, that the ALJ otherwise adopted Dr. Boatman's opinions, because his RFC findings regarding postural limitations mirror the findings of Dr. Boatman's report. (R. 26-27, 421). As the Tenth Circuit explained in *Haga*, an ALJ cannot adopt some opinions by an agency consultant while implicitly

14

rejecting others, without a sufficient explanation for the partial rejection. *Haga*, 482 F.3d at 1207-08.

While Payton's counsel did not raise the issue of the ALJ's omission from his RFC determination of the reaching limitation found by Dr. Boatman, the undersigned finds that this omission by the ALJ exacerbates his omission of Dr. Boone's opinion that Payton needed to avoid overhead activities. On remand, the ALJ must consider both Dr. Boone's limitation to avoidance of overhead activities and Dr. Boatman's reaching limitation. If he rejects these portions of the opinions of these two acceptable medical sources, then the ALJ needs to give a legally sufficient reason for those rejections.

## Conclusion

Because the ALJ erred in his consideration of the opinion evidence, the Court **REVERSES and REMANDS** the ALJ's decision for further consideration.

The Court takes no position on the merits of Payton's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Based on the foregoing, the decision of the Commissioner denying disability benefits to Claimant is **REVERSED AND REMANDED.**

Dated this 22nd day of October 2015.

Paul J. Cleary
United States Magistrate Judge